# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-IA-00464-SCT

*MALIYAH ASHUNTI HUBBARD, MINOR, BY*
*AND THROUGH TIFFANY HUBBARD, HER*
*MOTHER AND NATURAL GUARDIAN*

*v.*

*MCDONALD'S CORPORATION, MICHAEL L.*
*RETZER d/b/a MCDONALD'S*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/02/2009 |
| TRIAL JUDGE: | HON. JOSEPH H. LOPER, JR. |
| COURT FROM WHICH APPEALED: | GRENADA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM C. WALKER, JR. |
| | FRANK H. SHAW, JR. |
| ATTORNEYS FOR APPELLEES: | SUSAN N. O'NEAL |
| | FRANK THACKSTON |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 06/24/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRAVES, P.J., DICKINSON AND CHANDLER, JJ.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1. Tiffany Hubbard (Hubbard) slipped and fell at her job at a McDonald's restaurant on April 19, 2002. On April 29, 2002, Hubbard prematurely delivered her daughter, Maliyah Ashunti Hubbard (Maliyah). Maliyah, by and through Hubbard, commenced this negligence lawsuit against McDonald's Corporation and Michael L. Retzer, d/b/a McDonald's, (McDonald's), alleging, in part, that Hubbard's fall had proximately caused Maliyah's

premature birth and her injuries from complications of prematurity. Maliyah designated Dr. Anthony DeSalvo as an expert witness on the causal connection between Hubbard's fall and the premature delivery. The trial court granted McDonald's' motion to strike Dr. DeSalvo's testimony. This Court has granted Maliyah's petition for an interlocutory appeal.

**FACTS AND PROCEDURAL HISTORY**

¶2. On February 12, 2008, McDonald's filed the motion to strike, with attachments consisting of Hubbard's medical records from Grenada Lake Medical Center, the deposition of Dr. DeSalvo, and the affidavit of defense expert Dr. Paul Rice.[1] According to Hubbard's medical records from Grenada Lake Medical Center, she was admitted to the emergency department on April 19, 2002. She reported that she had "slipped on wet floor–fell to R side," and complained of right-sided abdominal pain. The records noted that Hubbard was twenty-three weeks pregnant, and that her membranes were intact.[2] Hubbard was monitored for approximately four hours and then discharged with instructions to rest.

¶3. Hubbard returned to the emergency room on April 26, 2002, complaining that on the previous Tuesday, her water had broken and run down her leg. She also had experienced cramping. Her admission diagnosis was recorded as "Fall-? Leaky Membrane." The nursing notes showed that a Nitrazine test was determined to be negative.[3] Based on a laboratory

---

[1] Only documentation relevant to the motion to strike has been included in the record on appeal.

[2] Dr. DeSalvo testified that "membranes" refers to the "bag" holding the baby and the amniotic fluid. A rupture of membranes means the bag has broken.

[3] Dr. DeSalvo explained that a Nitrizine test detects elevated pH in the vagina, and it is commonly used to test for the presence of amniotic fluid.

test, she was diagnosed with trichomonas, a vaginal infection, and sent home with medication. Hubbard returned the next day complaining of "cramping in hips and buttocks." She stated she had "clear fluid-like" vaginal discharge. A nurse noted that her membranes were intact and that she was not having contractions. She was discharged with a diagnosis of pressure pain and trichomonas.

¶4.    Hubbard visited the emergency room again on April 28, 2002, complaining of lower abdominal and back pain all day. At 12:55 a.m. on April 29, 2002, a nurse noted that she was in preterm labor. At this point, Hubbard was twenty-four-and-and-a-half weeks pregnant. Her membranes were noted to be intact. Dr. S.W. Bondurant treated Hubbard. She was administered IV fluids and tocolysis. Dr. Bondurant noted that Hubbard's pregnancy had been complicated by a trichomonas infection and by a fall at work, in which she had landed on her back. The nurse's notes reflect that, at 1:25 a.m., Hubbard had a "spontaneous rupture of membranes." At 2:29 a.m., she was transferred to the University of Mississippi Medical Center (UMC), where she delivered Maliyah prematurely. According to Dr. DeSalvo's deposition, the UMC medical records stated that Hubbard had a "bulging bag of water" when she arrived.

¶5.    According to Dr. DeSalvo's deposition, he is board-certified in obstetrics and gynecology. From his review of Hubbard's medical records and his experience, training, and expertise, Dr. DeSalvo testified to a reasonable degree of medical probability that Hubbard's fall at work was a significant contributing cause of her premature rupture of membranes and premature labor leading to Maliyah's premature birth. Dr. DeSalvo testified to a reasonable degree of medical probability that Hubbard's membranes actually had ruptured on or about

3

Tuesday, April 23, 2002, and that Hubbard's fall was a significant contributing cause of the rupture and premature labor.

¶6.    Dr. DeSalvo testified that Hubbard's documented pregnancy course after her April 19, 2002, fall supported his opinion that Hubbard's water had broken on or about April 23, 2002. He noted that Hubbard had reported on April 26, 2002, that her water had broken the previous Tuesday, that she had clear fluid running down her leg, and that she had cramps. Dr. DeSalvo testified that clear fluid and cramping are consistent with ruptured membranes. He testified that the presence of amniotic fluid in the vagina confirms ruptured membranes. However, he testified, the absence of amniotic fluid in the vagina does not exclude ruptured membranes.

¶7.    Dr. DeSalvo admitted that medical personnel did not diagnose ruptured membranes on April 26, 2002, and that the Nitrazene test, which would have detected amniotic fluid, was negative, but he cast doubt on the reliability of the Nitrazene test. He explained that a Nitrazene test does not specifically detect amniotic fluid, but only detects elevated pH in the vagina, which is indicative of the presence of amniotic fluid. He testified that trichomonas infection also elevates vaginal pH. He testified that, because Hubbard had trichomonas, her vaginal pH was elevated, and the Nitrazene test should have been positive. Dr. DeSalvo opined that, because the Nitrazine test failed to detect Hubbard's elevated vaginal pH from trichomonas, the test was improperly administered. Dr. DeSalvo admitted that trichomonas infection can be a contributing factor in preterm labor, but he testified that, for the vast majority of expectant mothers, a vaginal infection does not cause preterm labor. He stated that the discharge caused by trichomonas is usually yellow, not clear.

4

¶8.    Dr. DeSalvo also opined that Hubbard's rupture of membranes on or about April 23, 2002, was of the type known as a "high leak." Dr. DeSalvo explained that if the membranes rupture at the bottom of the bag near the cervix, then the amniotic fluid quickly drains out of the vagina. But if the membranes rupture high "in the interface between the membranes and the wall of the uterus," then "the water will trickle out, but the water at the bottom will still bulge," a type of rupture known as a "high leak." Dr. DeSalvo testified that a high leak can be difficult to diagnose because the condition may cause small amounts of amniotic fluid to leak intermittently. He also testified that a high leak can have a latency period of several days. Dr. DeSalvo testified to a reasonable degree of medical probability that a fall such as the one Hubbard reported could have caused a high leak.

¶9.    Dr. DeSalvo testified that a negative Nitrazine test cannot rule out a high leak, because there may be no amniotic fluid in the vagina when the test is administered due to intermittent leakage. Dr. DeSalvo testified that the following medical evidence was consistent with a high leak: (1) Hubbard's multiple trips to the emergency room with clear fluid leakage and cramping; (2) her elevated white blood cell count on April 29, 2002; (3) a placental pathology report which was consistent with hemorrhage; and (4) the fact that Hubbard was noted to have had a bulging bag of water when she was admitted to UMC four hours after having had a spontaneous rupture of membranes at Grenada Lake Medical Center. Dr. DeSalvo explained that the elevated white blood cell count on April 29, 2002, was consistent with a mild membrane infection caused by a high leak, and that a vaginal infection like trichomonas does not cause a high white blood cell count. He testified that the fact that Hubbard still had a bulging bag of water after her spontaneous rupture of membranes four

5

hours previously indicated that the location of the rupture was not in front of the cervix, and that she had a high leak.

¶10.   McDonald's' expert, Dr. Rice, was board-certified in obstetrics and gynecology.  In his affidavit, Dr. Rice stated that there was no objective medical evidence that Hubbard had suffered a rupture of membranes prior to April 29, 2002, and no objective medical evidence of preterm labor until April 28, 2002.  Dr. Rice testified that, to a reasonable degree of medical certainty, a fall of the type Hubbard experienced could not be a significant contributing cause of a premature rupture of membranes ten days later, or of Hubbard's preterm labor.  Like Dr. DeSalvo, Dr. Rice based his opinions on his review of Hubbard's medical records and his experience, training, and expertise.

¶11.   In its brief in support of the motion to strike, McDonald's argued that Dr. DeSalvo's opinions were wholly speculative, unreliable, and inadmissible under Mississippi Rule of Evidence 702.  McDonald's argued that Dr. DeSalvo's opinion that Hubbard's membranes had ruptured on or about April 23, 2002, was contradicted by the medical records showing that (1) the Nitrazine test was negative for amniotic fluid on April 26, 2002, (2) she had a trichomonas infection, and (3) on April 29, 2002, approximately half an hour before her spontaneous rupture of membranes, Hubbard's membranes were observed to be intact.  McDonald's also contended that Dr. DeSalvo's opinion that the Nitrazine test was not performed properly was based on speculation and conjecture.

¶12.   In response to the motion to strike, Hubbard filed a brief and a supplemental response with an attached affidavit by Dr. DeSalvo and medical literature supporting his opinions.  According to one article, an elevated vaginal pH occurs in ninety-seven percent of women

6

with trichomonas; a normal vaginal pH rules out trichomonas. Two other articles also stated that trichomonas causes a high vaginal pH. A form describing the procedure for administration of the Nitrazine test stated that "false negative results may be produced by prolonged rupture of membranes (longer than 24 hours) or when a small volume of fluid has leaked." The form also stated that if the Nitrazine test is negative, and the more accurate Fern test is positive, then amniotic fluid is present due to the greater specificity of the Fern test.

¶13. The motion to strike came on for hearing on January 12, 2009. At the conclusion of the hearing, the trial court granted the motion. The trial court determined that there was nothing in the medical records to support Dr. DeSalvo's opinion that Hubbard had a slow leak of amniotic fluid that was caused by the fall but went undiagnosed on April 19, 26, 27, and 28. Thus, the trial court found that there was insufficient facts or data to support his opinions. The trial court found that Dr. DeSalvo's testimony was based on speculation, guesswork, and conjecture, stating that Dr. DeSalvo "strings together a number of possibilities and then offers them as fact." The trial court entered an order reciting the court's bench ruling. This Court granted Maliyah's petition for an interlocutory appeal from the order striking Dr. DeSalvo's testimony.

## DISCUSSION

DID THE TRIAL COURT ERR IN EXCLUDING DR. DESALVO'S EXPERT TESTIMONY?

¶14. This Court reviews the admission or exclusion of expert testimony for abuse of discretion. *Franklin v. Tedford*, 18 So. 3d 215, 233 (Miss. 2009). A trial court's decision

7

constitutes an abuse of discretion if the decision was arbitrary and clearly erroneous. *Kilhullen v. Kansas City So. Ry.*, 8 So. 3d 168, 172 (Miss. 2009) (quoting *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003)). "A trial court's decision to allow expert testimony will be affirmed '[u]nless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the accused in a criminal case.'" *Bullock v. Lott*, 964 So. 2d 1119, 1128 (Miss. 2007) (quoting *Jones v. State*, 918 So. 2d 1220, 1223 (Miss. 2005)).

¶15.    Mississippi Rule of Evidence 702 governs the admission of expert testimony. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702. Rule 702 is identical to Rule 702 of the Federal Rules of Evidence. This Court applies the federal standard, as articulated in *Daubert v. Merrill Dow Pharmeceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), to the admissibility of expert testimony under Mississippi Rule of Evidence 702. *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 39 (Miss. 2003). In *Daubert*, the United States Supreme Court determined that a trial judge is vested with a gatekeeping responsibility concerning the admission of expert testimony. *Daubert*, 509 U.S. at 597. As the gatekeeper, the trial court must ensure that expert testimony admitted at trial is both relevant and reliable

8

as required by Rule 702. *Id.* at 589.

¶16.    Relevance is established when the expert testimony is sufficiently tied to the facts of the case that it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 591. In evaluating reliability, the court's "focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Expert testimony admitted at trial must be based on scientific methods and procedures, not on unsupported speculation or subjective belief. *Miss. Dep't of Mental Health v. Hall*, 936 So. 2d 917, 928 (Miss. 2006).

¶17.    The court in *Daubert* developed a nonexclusive list of factors to be used to assess reliability: (1) whether the theory or technique can be tested; (2) whether the theory or technique has been the subject of peer review and publication; (3) whether there is a high known or potential rate of error respecting the technique; (4) whether there are standards that control the operation of the technique; and (5) whether the theory or technique has been generally accepted within the relevant scientific community. *McLemore*, 863 So. 2d at 37 (citing *Daubert*, 509 U.S. at 592-94). These factors may or may not be pertinent in each case; their applicability depends on the "particular circumstances of the particular case at issue," including "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150. The trial court's inquiry into the admissibility of expert testimony is to be "a flexible one." *Daubert*, 509 U.S. at 594.

¶18.    Rule 702 also provides three requirements that were added after *Daubert* and *Kumho Tire*. These requirements are that: (1) the expert testimony must be based on sufficient facts or data, (2) it must be the product of reliable principles and methods, and (3) the expert must

have reliably applied the principles and methods to the facts of the case. Miss. R. Evid. 702.

¶19.     This Court has stated that "an expert's testimony is presumptively admissible when relevant and reliable." *McLemore*, 863 So. 2d at 39. The weight and credibility of expert testimony are matters for determination by the trier of fact. *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 747 (Miss. 2008) (quoting *Palmer v. Biloxi Reg'l Med. Ctr., Inc.*, 564 So. 2d 1346, 1355 (Miss. 1990)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *McLemore*, 863 So. 2d at 36 (quoting *Daubert*, 509 U.S. at 596).

¶20.     Hubbard argues that Dr. DeSalvo's testimony was reliable and admissible. Hubbard points out that Dr. DeSalvo based his opinion on his review of the medical records and his experience, training, and expertise, which was the same methodology used by McDonald's' expert, Dr. Rice. Hubbard contends that Dr. DeSalvo's opinions were not based upon his subjective belief or unsupported speculation, but upon Hubbard's medical records and the medical literature. Hubbard argues that the medical records and medical literature reviewed by Dr. DeSalvo constituted sufficient facts or data to form the basis of reliable opinions.

¶21.     McDonald's does not contend that Hubbard's fall could not have caused a high leak; rather, it argues that the medical records did not adequately support Dr. DeSalvo's opinion that a high leak occurred in this case. McDonald's argues that Dr. DeSalvo's testimony was speculative for two primary reasons. First, McDonald's argues that, because the medical records show that medical personnel noted that Hubbard's membranes had ruptured on April 29, 2002, any opinion that the rupture had occurred earlier than April 29, 2002, is

10

speculative. Second, McDonald's argues that Dr. DeSalvo's opinion that the Nitrazine test was performed incorrectly was speculative. McDonald's argues that Dr. DeSalvo merely enumerated possibilities and offered them as fact.

¶22. McDonald's relies on *Treasure Bay Corp. v. Ricard*, 967 So. 2d 1235 (Miss. 2007), and *Bullock v. Lott*, 964 So. 2d 1119 (Miss. 2007). In *Treasure Bay*, the wrongful-death beneficiaries of a pedestrian killed by a drunk driver sued two casinos, Treasure Bay and Adventures, under the Mississippi Dram Shop Act, Mississippi Code Section 67-3-73. *Treasure Bay,* 967 So.2d at 1237. The driver gave a statement to police admitting that he had consumed seven to eight beers between 10:30 p.m. and 3:30 a.m., first at Treasure Bay and then at Adventures. *Id.* At 6:41 a.m., after the accident, the driver had a blood alcohol content level (BAC) of .088%. *Id.* at 1238. The plaintiff's expert, Dr. Steven Hayne, testified that the driver could not have had a BAC as high as .088% at 6:41 a.m. if he had consumed only seven to eight beers between 10:30 p.m. and 3:30 a.m. *Id.* Dr. Hayne testified that, in order to have had a BAC of .088% at 6:41 a.m., the driver must have consumed a greater amount of alcohol at the casinos and that he would have been visibly intoxicated, as required for liability under the Dram Shop Act. *Id.*; *see* Miss. Code Ann. § 67-3-73 (4) (Rev. 2005).

¶23. Treasure Bay and Adventures challenged the reliability of Dr. Hayne's testimony. The Court found that Dr. Hayne fairly had based his conclusion that the driver was visibly intoxicated when he left Adventures on the driver's testimony that he took his last drink of alcohol at Adventures. *Id.* at 1242. However, the Court found that there was no evidence from which Dr. Hayne could have concluded the driver had been visibly intoxicated when

11

he left Treasure Bay before going to Adventures. *Id.* The only evidence of the driver's consumption level was his own statement that he had consumed only a few beers at Treasure Bay; there was nothing from which Dr. Hayne could have concluded the driver had consumed enough alcohol at Treasure Bay to have been visibly intoxicated. *Id.* Therefore, the Court concluded that "Dr. Hayne's opinion that [the driver] was visibly intoxicated while at Treasure Bay is not based upon the facts and is therefore unreliable." *Id.*

¶24.    In *Bullock,* a child died of an intraventricular abscess to the brain associated with sinusitis. *Bullock*, 964 So. 2d at 1122. His parents filed a wrongful-death action against the physician who had treated the child for sinusitis, alleging he had breached the standard of care by failing to perform a CT scan, MRI, or sinus x-ray, any of which would have revealed the abscess, which was treatable. *Id.* The plaintiffs tendered the testimony of Dr. Larry F. Gibson, who testified that the standard of care required the administration of one of these tests and that testing would have revealed a "midline shift," which is indicative of an abscess. *Id.* at 1123, 1129. He also testified that the autopsy report showed that pus was found in the brain. *Id.* at 1131. The defendant argued that Dr. Gibson's testimony was unreliable because it was not based on sufficient facts or data. *Id.* at 1127. Indeed, Dr. Gibson had based his opinions that testing would have revealed the abscess on the autopsy report; however, nothing in the autopsy report supported the conclusion that testing would have revealed a midline shift. *Id.* at 1131. Also, the autopsy report showed that pus was in the child's ventricular system, not in the brain. *Id.* Because Dr. Gibson's opinions conflicted with the autopsy report on which they purportedly were based, this Court held that Dr. Gibson's opinions were not based on sufficient facts or data and were unreliable. *Id.* at 1131-32.

12

¶25. Applying this Court's criteria under Rule 702, set out above, to the facts of this case, we find that the trial court's ruling that Dr. DeSalvo's expert testimony was unreliable was arbitrary and clearly erroneous, and constituted an abuse of discretion. Unlike the expert opinions found inadmissible in *Treasure Bay* and *Bullock*, Dr. DeSalvo's opinions were based upon sufficient facts or data, because they were supported by and did not contradict Hubbard's medical records. Dr. DeSalvo did not ignore the fact that medical personnel did not detect a rupture of membranes until April 29, 2002. Dr. DeSalvo explained that Hubbard's entire clinical picture was consistent with a "high leak," a rupture of membranes that went undiagnosed by medical personnel due to intermittent leaking of amniotic fluid and the location of the rupture. Dr. DeSalvo explained that a high leak was consistent with Hubbard's complaints on April 26 and 27 of cramping and leaking of clear fluid, which she attributed to her water having broken. Dr. DeSalvo testified that a high leak often takes several days to diagnose because leaking of amniotic fluid is intermittent. Dr. DeSalvo testified that Hubbard's bulging bag of water after arriving at UMC confirmed the location of the rupture as a "high leak" to a reasonable degree of medical probability. These opinions were based on Dr. DeSalvo's interpretation of Hubbard's documented signs and symptoms based on his experience, training, and expertise, and did not amount to mere speculation.

¶26. McDonald's argues that the negative Nitrazine test and positive trichomonas test conclusively establish that Hubbard's cramping and fluid leakage were attributable to trichomonas, not a high leak. However, Dr. DeSalvo testified that, while a negative Nitrazine test usually would rule out a rupture of membranes, a negative Nitrazine test does not necessarily rule out a high leak, because the leaking of amniotic fluid is intermittent.

13

Alternatively, he testified that Hubbard's Nitrazine test probably was performed improperly because it should have, but did not, detect the trichomonas infection from which Hubbard indisputably suffered. Dr. DeSalvo also testified that, although trichomonas can be a cause of preterm labor, in the majority of cases, it does not cause preterm labor. All of these opinions were fully supported by the medical literature.

¶27. Under our standards for the admission of expert testimony, a qualified medical expert is permitted to extrapolate causation testimony from the patient's clinical picture although the medical records contain no objective medical evidence establishing causation. *See Poole v. Avara*, 908 So. 2d 716, 720-25 (Miss. 2005). Poole died after Dr. Avara performed anastomosis, a procedure in which a section of Poole's colon was cut out and the two ends sewn back together. *Id.* at 720. An autopsy determined that Poole had experienced a leakage of feces and bacteria from a tear in the surgical seam on her colon. *Id.* Poole's wrongful-death beneficiaries claimed that the seam had torn because Dr. Avara negligently had performed the anastomosis, and that the leakage was the proximate cause of Poole's death. *Id.* Dr. Avara offered expert testimony that the CPR and resuscitation efforts performed on Poole had caused the seam to tear, and that the leakage was not the cause of death. *Id.* at 721-22. Among other arguments, Poole's beneficiaries argued that Dr. Avara's testimony was not based on sufficient facts or data because "the only certain fact [was] that the suture burst, not what the cause of the burst was." *Id.* at 722.

¶28. This Court held that the testimony was admissible. *Id.* at 725. The Court found that Dr. Avara's testimony as to the cause of the tear constituted "scientific knowledge," because it constituted a medical opinion based on the experience, training, and expertise of a qualified

14

medical expert. *Id.* at 724. The Court stated that "[r]equiring that the subject of expert testimony be known to a certainty is not necessary either, however, because, as the *Daubert* Court pointed out, 'there are no certainties in science.'" *Id.* at 723-24 (quoting *Daubert*, 509 U.S. at 590). "Unlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Id.* at 724 (quoting *Daubert*, 509 U.S. at 592).

¶29. In this case, the medical records did not establish the cause or significant contributing cause of Hubbard's rupture of membranes and preterm labor. Like Dr. Rice, Dr. DeSalvo based his opinions on his interpretation of the medical records in light of his experience, training, and expertise as a qualified obstetrician and gynecologist. As in *Poole*, Dr. DeSalvo should have been permitted to offer his causation theory, because it was grounded in Hubbard's medical records; Dr. DeSalvo's experience, training, and expertise; and the medical literature. His opinions constituted a scientifically grounded theory of causation, not the "junk science" which the *Daubert* Court sought to preclude from jury consideration. *Huss v. Gayden*, 571 F.3d 442, 460 (5th Cir. 2009). The credibility of Dr. DeSalvo's testimony in light of the competing testimony of Dr. Rice or of other defense experts is a matter for the jury to weigh.

**CONCLUSION**

¶30. We hold that the trial court abused its discretion by finding that the expert testimony of Dr. DeSalvo was unreliable. The ruling of the trial court is reversed and this case is remanded for further proceedings consistent with this opinion.

¶31. **REVERSED AND REMANDED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, LAMAR, KITCHENS AND PIERCE, JJ., CONCUR.**