# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00888-COA

GLORIA PITTMAN, AS ADMINISTRATOR OF        APPELLANT
THE ESTATE OF ERRIEL MARIE JONES

v.

MEMORIAL HOSPITAL AT GULFPORT        APPELLEE

DATE OF JUDGMENT:        05/16/2019
TRIAL JUDGE:        HON. ROGER T. CLARK
COURT FROM WHICH APPEALED:        HARRISON COUNTY CIRCUIT COURT,
        FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:        DOUGLAS L. TYNES JR.
        COURTNEY PARKER WILSON
ATTORNEY FOR APPELLEE:        ROLAND F. SAMSON III
NATURE OF THE CASE:        CIVIL - MEDICAL NEGLIGENCE
DISPOSITION:        AFFIRMED - 06/30/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., GREENLEE AND McCARTY, JJ.

### McCARTY, J., FOR THE COURT:

¶1. Prior to her death, Erriel Jones filed a complaint for medical negligence against Memorial Hospital at Gulfport. Erriel alleged that she suffered both a fractured shoulder and a stage II bedsore on her buttocks while in Memorial's care.

¶2. Following a bench trial, the trial court found for the hospital, holding that Erriel failed to prove her case by a preponderance of the evidence. Erriel's mother, acting as administrator of her estate, now appeals the trial court's decision. Because the trial court was not manifestly wrong and did not apply the wrong legal standards, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶3.　　Erriel Jones suffered from a number of debilitating diseases prior to her death in 2017.[1]　Aside from a sickle cell anemia diagnosis shortly after birth, the disabilities pertinent to this case include stroke-induced quadriplegia at age seven, a severe case of osteoporosis, and a hardening of her muscles that stiffened her upper body.　She also suffered from a brittle-bone disease that progressively killed her bone tissue and had chronic arthritis in her left shoulder.　As early as 2010, Erriel had severe left shoulder pain.

¶4.　　These co-morbities required Erriel to undergo a series of routine blood transfusions throughout her unfortunately short lifetime.　She was also highly susceptible to developing frequent infections and bedsores.[2]

¶5.　　These co-morbities also left Erriel's entire body stiff and almost completely immobile. She spent most of her life bedridden, ventilator-dependent, and wheelchair-bound.　With the exception of moving her left arm slightly to complete school work, Erriel was totally dependent on others to move her body.　A port was placed in her right shoulder to facilitate the administration of the many drugs her body required.

¶6.　　On April 24, 2015, Erriel was admitted to Memorial for one of her monthly blood transfusions.　The record indicates that upon admission she was in a severe state of muscle and weight loss and was malnourished, weighing only 103 pounds.　After assessing Erriel,

---

[1]After the events in this case, Erriel died at 27 from pre-existing medical complications unrelated to the hospital's alleged breach of care during her hospitalization. Her mother did not seek recovery in this case under a theory of wrongful death.

[2] Erriel's history of bedsores began in 2001, and she was treated for them in 2010 and 2011.　Additionally, Erriel developed a stage III bedsore when she was diagnosed with end-stage liver disease in 2016.　The bedsore never healed and a stage IV bedsore followed when she was in hospice.

the hospital personnel found that she was suffering from the severe infection of sepsis. They determined that the port in her chest was likely causing the infection. The hospital personnel decided that Erriel would need to have the port surgically removed.

¶7. On April 27, 2015, before removing the port, the nurse or nurses responsible for Erriel's care recorded she did not have a "[skin] breakdown at [that] time per nursing assessment." In other words, the nurse did not detect any ulcers or unusual lacerations on Erriel's body after evaluating her skin that day.

¶8. Due to Erriel's condition and history with ulcers, the hospital offered a specialty bed—an alternating pressure mattress that shifted its pressure every 10 to 15 minutes to safeguard against the development of pressure sores. Erriel's mother, Ms. Gloria Pittman, testified that she initially declined the hospital's offer because she assumed Erriel would not be in the hospital for long. When she later learned Erriel would need additional treatment, she did request the specialty bed.

¶9. Approximately six days later, a hospital record dated May 2, 2015, noted that Erriel had a pressure sore near her tail bone and gluteal areas that was "in healing stages of [the] previous pressure areas." The record further documented a report from Ms. Pittman informing the hospital that Erriel had that pressure sore since she left home. Scars from "healed pressure ulcers" were also detected on May 4, 2015.

¶10. Based on the hospital's policy, the nurses were required to actively turn high-risk patients like Erriel every two hours to avoid the formation or aggravation of bed sores. Although the hospital testified that it regularly repositioned Erriel during diaper changes, skin

3

care, baths, and other treatments, it only documented twice in its computer system that Erriel was turned. However, the records show that the hospital frequently repositioned Erriel with pillows, which was allegedly another available option to document that a patient was repositioned.

¶11. On May 4, 2015, Erriel was scheduled to have the infected port removed from her arm. After she was taken back to the hospital's imaging department for the operation, four of the hospital's personnel used a draw sheet to move Erriel from her hospital bed to the procedure table "without incident." Ms. Pittman testified that Erriel did not complain of arm pain at that time. During the procedure, the port was removed "without incident." But when the personnel transferred Erriel from the procedure table back to her hospital bed after the operation, Erriel reported pain in her left arm "immediately."

¶12. Ms. Pittman and the hospital heavily dispute the remaining facts of this case. Ms. Pittman claims that Erriel's arm fell to her side during her transfer from the procedure table to the hospital bed. She further claims that Erriel's body "slid on top of her left arm" and that the personnel laid her on that arm. Ms. Pittman testified at trial that Erriel attempted to utter the words, "wait, wait, wait" before the personnel laid her on top of the hospital bed. Erriel claimed she heard her arm "pop" at that time.

¶13. After complaining to personnel that her arm was broken and that she was in pain, a doctor assessed Erriel's arm with an X-ray machine. He diagnosed her with an "acute left surgical neck fracture." At trial, Ms. Pittman's expert witness identified the fracture as an "oblique spiral fracture of the left surgical neck," which typically results from "a twisting of

4

the upper shoulder." In other words, the fracture was caused by a "spiral break."

¶14. For its part of the dispute, the hospital claims its trained personnel exercised care when they transferred Erriel's body from the table to the bed. One staff member who was allegedly "in the best position to observe her" during the transfer testified that Erriel's arm never fell outside of the draw sheet. In fact, he stated, Erriel's arms were stiff, immobile, and "constricted on top of her body" all the time. One of the hospital's nurses testified that Erriel's arms were "across her chest, almost near her waist." Both hospital staff members denied that Erriel was laid on top of her arm. The hospital claims that although she did complain of arm pain, Erriel did not appear to be in "any more pain than usual" after the transfer.

¶15. At trial, the hospital's expert witness identified Erriel's fracture as "subacute." In the medical parlance, a subacute fracture is older, while an acute fracture is newer. The expert opined that because there was callus on the bone, the break was subacute and indicated that the fracture was older and in the process of repairing. In other words, the expert proposed that the fracture was old and likely pre-existed the date of Erriel's operation by two or more weeks. In a more nuanced view, the hospital's radiologist, who reviewed Erriel's X-rays, testified that the injury was possibly an acute injury on top of a subacute fracture—a previously fractured bone that had been fractured again.

¶16. One of the hospital's experts testified that based on a reasonable degree of medical certainty, Erriel's fracture stemmed from "avascular necrosis with subchondral collapse and a preexisting fracture and her sickle cell disease," while the hospital's records indicated that

5

Erriel suffered an "atraumatic fracture of the left proximal humerus." In other words, the hospital argued the fracture was not induced by trauma and was likely the result of natural fatigue to the bone due to Erriel's pre-existing brittle-bone disease.

¶17. Following a bench trial, the trial court ruled in favor of the hospital on both of the claims. It found the plaintiff failed to prove by a preponderance of the evidence that the hospital was responsible for either of Erriel's injuries. Aggrieved, Ms. Pittman appealed to this Court.

## STANDARD OF REVIEW

¶18. This Court must adhere to "the substantial evidence standard" when reviewing a trial court's factual findings that stem from a bench trial. *Delta Reg'l Med. Ctr. v. Taylor*, 112 So. 3d 11, 19 (¶21) (Miss. Ct. App. 2012) (quoting *Covington Cty. v. G.W.*, 767 So. 2d 187, 189 (¶ 4) (Miss. 2000)). We will not reverse the trial court's decision unless that decision is "manifestly wrong or clearly erroneous [,] or [the trial court] applied an erroneous legal standard." *Id.*

## ANALYSIS

¶19. Ms. Pittman urges this Court to reverse the trial court's decision, arguing that the hospital is liable for the injuries Erriel allegedly sustained while in its care. To support her position, she presents three arguments: (1) the trial court's conclusions as to Erriel's fracture were not supported by substantial evidence; (2) the trial court erred by failing to grant her a presumption of negligence under the doctrine of res ipsa loquitur as to Erriel's fracture, and (3) as it relates to Erriel's decubitus ulcer, the trial court relied on speculative testimony over

6

conclusive documentary evidence in finding for the hospital. We will address each of these issues respectively.

## I. The trial court's conclusions as to Erriel's fracture were supported by substantial evidence.

¶20. Arguing the trial court "failed to consider relevant evidence" in forming its opinion, Ms. Pittman insists the trial court's conclusions as to Erriel's fractures were not supported by substantial evidence.

¶21. "A court's ruling is not based on substantial evidence if glaringly obvious evidence is ignored." *Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 147 (¶26) (Miss. 2007). But when looking for clearly ignored evidence, this Court must carefully consider the long-standing rule that declares that in bench trials, "a judge may place whatever weight he or she chooses on expert testimony. . . ." *Id.* For "the failure to acknowledge or rely upon the testimony of a particular expert is not error." *Id.* In other words, we are faced with the task to determine whether there was clearly overlooked evidence in this case or whether the issues are merely conflicting facts that a trial court may weigh in its discretion.

¶22. Ms. Pittman relies on her expert's trial testimony to support her argument that the trial court failed to rely on substantial evidence in finding for the hospital. Specifically, she notes that based on the expert's examination of the X-rays, Erriel suffered an oblique fracture, which can only be caused by a "twisting of the arm." The expert further opined that Erriel's fracture was in the exact location one would expect had she been laid on top of her arm.

¶23. Additional concerns Ms. Pittman addresses on appeal include the fact that there was no visible fracture on Erriel's chest X-ray four days prior to the incident and no recorded

complaint from Erriel as to left arm pain prior to the incident. Finally, Ms. Pittman points out that the hospital diagnosed Erriel's fracture as acute rather than subacute—that it was new, and not old.

¶24. Yet the hospital's witnesses and experts fully rebutted these arguments at trial. They opined that the presence of a potential callus on the X-ray indicated that Erriel had an old fracture that possibly pre-existed the incident by several weeks. Additionally, the hospital's experts reasoned that Erriel's chest X-ray could have simply failed to show Erriel's shoulder fracture because the focus of the X-ray was on her chest and not her shoulder. Finally, the experts pointed out that Erriel suffered from a very severe case of osteoporosis. Sadly, Erriel's bones were so brittle that she could suffer a break from the mere act of sneezing. The hospital's experts testified that because of Erriel's uniquely vulnerable condition and co-morbidities, her bones would have broken even with the best of care because of the natural fatigue to her bone over time. Therefore, the hospital argued, the injury was not caused by a sudden trauma. To further solidify its defense, the hospital introduced all four employees who moved Erriel after the procedure to remove her port. Each testified that they met the standard of care during her transport.

¶25. Because the hospital gave reasonable explanations to rebut Ms. Pittman's arguments, under our limited standard of review we find that she has failed to muster evidence that is "glaringly obvious" enough to warrant reversal of the trial court's decision. *Pounders*, 970 So. 2d at 147 (¶ 26). This assignment of error centers on conflicts in fact, which are left to the trial court's discretion.

8

¶26. Our precedent is firmly grounded in the rule that findings that turn solely on conflicts in fact and expert opinion are to be left undisturbed by this Court and will not constitute reversible error. *Id.* (Stating that "the failure to acknowledge or rely upon the testimony of a particular expert is not error"); *Johnson,* 977 So. 2d at 1152 (¶21) ("We note at the outset that a trial court commits no error in finding one expert more persuasive than another, as the trial court, sitting as trier of fact, is the sole judge of the credibility of all witnesses, including experts."). Likewise, "[t]he mere fact that testimony is disputed does not render it incredible." *Jacob Hartz Seed Co. v. Simrall & Simrall*, 807 So. 2d 1271, 1275 (¶15) (Miss. Ct. App. 2001). "Unless the testimony is so incredible as to be absolutely unworthy of belief, this Court will not re-weigh the evidence." *Id.*

¶27. In the absence of clearly ignored evidence, Ms. Pittman is essentially asking this Court to re-weigh the conflicting expert testimony the trial court has already weighed. But "[t]rial and appellate courts have separate institutional roles," and "[o]ur role is that of an appellate court and not as triers of fact *ab initio*." *Tricon Metals & Servs*. *Inc*. *Topp*, 516 So. 2d 236, 239 (Miss. 1987).

¶28. In a bench trial, the trial court ultimately decides who is deemed champion of the battle of the experts. After weighing all conflicting expert opinions, the trial court found in favor of the hospital. We decline to disturb the trial court's decision.

## II. The plaintiff was not entitled to a presumption of negligence under the doctrine of res ipsa loquitur.

¶29. Ms. Pittman argues that she was entitled to a presumption of negligence under the res ipsa loquitur doctrine.

9

¶30.    A party must satisfy two prongs to gain a presumption of negligence under the res ipsa loquitur doctrine. The party must show that: (1) "the instrumentality causing the injury was under the control and management of the defendant," and (2) "the occurrence resulting in the injury does not happen in the ordinary course of events, where due care has been exercised." *Austin v. Baptist Mem'l Hosp.-N. Miss.*, 768 So. 2d 929, 932 (¶10) (Miss. Ct. App. 2000).

¶31.    In *Austin*, a man developed rhabdomyolysis in his right leg after undergoing knee surgery at a hospital. *Id*. at 931 (¶4). He sued the hospital and surgeon for his injuries, arguing that the doctrine of res ipsa loquitur applied to his case. *Id*. at 932 (¶9). The surgeon maintained that the man's injuries could have resulted from any type of trauma to the leg or could have been a consequence of "excessive exercise." *Id*. at 931 (¶4). Ultimately believing the surgeon's testimony, and after concluding that the injury was not "under the control and management of the defendant," the *Austin* court found that the appellant failed to meet the first prong of res ipsa loquitur. *Id*. at 933 (¶14).

¶32.    The case at bar is similar to *Austin*. We cannot say that "the instrumentality causing the injury was under the control and management of the defendant" because there is substantial evidence that Erriel suffered a fracture from natural fatigue to her bone due to her severe case of osteoporosis. *Id*. at 932 (¶10). Accordingly, it is highly possible that the "the instrumentality causing the injury" was not "under the  control and management of the defendant." *Id*.

¶33.    Neither can we say that prong two of the doctrine was met for the same reason. Expert testimony was introduced at trial to demonstrate that Erriel's case of avascular

necrosis was so severe that her bones would have broken even with the best of care. Also, the hospital noted in its records that Erriel suffered an "atraumatic fracture of the left proximal humerus," which means the fracture was not induced by trauma and was likely the result of natural fatigue to the bone due to the brittle-bone disease as mentioned above. Based on the foregoing, "the occurrence resulting in the injury" *could have* happened "in the ordinary course of events," even "where due care [had] been exercised." *Id*.

¶34. The trial court found in favor of the hospital's position that due to the nature of her illnesses, Erriel could have suffered a fracture at any time. As announced earlier, we decline to disturb its findings as to this issue.

¶35. We affirm that Ms. Pittman is not entitled to a presumption of negligence under the doctrine of res ipsa loquitor.

### III. The trial court did not rely on speculative testimony over conclusive evidence when making its determination as to Erriel's decubitus ulcer.

¶36. Ms. Pittman argues the trial court relied on speculative testimony over conclusive evidence when making its determination as to Erriel's debucitus ulcer. We find this argument unpersuasive.

¶37. When an expert testifies at trial, her "testimony must be grounded in the methods and procedures of science, not merely a subjective belief or unsupported speculation." *Worthy v. McNair*, 37 So. 3d 609, 615 (¶16) (Miss. 2010). Likewise, expert testimony is reliable if it is "'based on sufficient facts or data' and [is] 'the product of reliable principles and methods.'" *Id*. (quoting M.R.E. 702). Based on case precedent, one can conclude that an

11

opinion is based on sufficient facts or data if it is "supported by and [does] not contradict . . . medical records." *Hubbard ex rel. Hubbard v. McDonald's Corp.*, 41 So. 3d 670, 677 (¶25) (Miss. 2010). A court will also look to an expert's "experience, training, and expertise" when considering the integrity of her testimony. *Id*. at 673 (¶10).

¶38. Ms. Pittman claims her daughter was not regularly turned. However, one of the hospital's experts, a nurse with over thirty years of experience, testified that Erriel would have developed an ulcer much earlier during her stay at the hospital and at a much more advanced stage if she had not been turned every two hours.

¶39. Ms. Pittman argues this testimony was speculative for two reasons. First, she insists that the expert failed to support her testimony with medical literature, evidence in the record, or other forms of tests and research. Second, Ms. Pittman seizes on the expert's admission that she never spoke with the nurses responsible for Erriel's care to find out whether the patient was actually turned. Additionally, the expert testified that she did not know how often Erriel was turned, but she believed Erriel was turned every two hours based on her condition.

¶40. While it is true that the hospital's expert did not offer medical literature to support her testimony, the record provides clues to help us reach the conclusion that the nurse's testimony was accurate. First, Erriel's medical records reveal various co-morbidities and physical conditions that made her highly susceptible to the development of bedsores. She was undisputedly a "high-risk" patient. Second, Ms. Pittman's expert testified during trial that turning a patient every two hours is important because ulcers, especially for high-risk

12

patients like Erriel, can develop in as little as two hours. Yet nothing in the record indicates that Erriel developed an ulcer that soon. In fact, the first reference to a sore in the records is dated May 2, 2015—nearly one week after Erriel's admission. That sore was noted to be "in healing stages" and existed when Erriel was at home, according to her mother. Notably, the sore detected on that day was not identified as a stage I-IV ulcer.

¶41. Given Erriel's medical condition, it is unreasonable to believe that a sore would remain "in healing stages" rather than in a progressively deteriorating stage nearly one week after her admission if she was truly not turned every two hours. But it is reasonable to believe that Erriel should have developed a progressively deteriorating ulcer at that point if she were not turned. However, the record dated May 2, 2015, conflicts with this theory. These findings are consistent with the expert's testimony that Erriel would have developed an ulcer much earlier had she not been turned every two hours.

¶42. Ms. Pittman strongly urges this Court to believe that the hospital's failure to chart Erriel's turns was irrefutable evidence ignored by the trial court. Specifically, she argues that because the hospital failed to document Erriel's turns every two hours, its failure to document conclusively proves that Erriel was indeed not turned every two hours. However, we rejected a version of this argument in *Lander v. Singing River Hospital System*, 933 So. 2d 1043 (Miss. Ct. App. 2006). The appellant in *Lander* argued that the nurses failed to document "site care and tubing changes," and that this presumptively meant that "such care did not occur." *Id*. at 1046-47 (¶14). We disagreed and held that the argument "lack[ed] support in the law . . . ." *Id.* Here, the expert grounded her testimony in her extensive experience in the

13

field and review of Erriel's general medical condition, which revealed that she was already prone to ulcers. It was not so speculative as to require exclusion or to require a finding that there was a breach of the standard of care.

¶43. When considering these factors in aggregate, we find that the expert's testimony is consistent with Erriel's medical records and is further supported by her personal experience as a nurse with over thirty years of experience. Therefore, we find that her testimony was not speculative and did not require exclusion.

¶44. We further conclude that the nurse's failure to confirm whether Erriel was turned was immaterial under the unique facts of this case. Likewise, the fact that the nurse did not know specifically how many times Erriel was turned does not impact the resolution of this point. Although both of these facts suggest that the expert lacked firsthand knowledge as to Erriel's care, "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *McDonald's Corp.*, 41 So. 3d at 678 (¶28) (quoting *Poole v. Avara*, 908 So. 2d 716, 724 (¶ 16) (Miss. 2005)). Considering this rule, we decline to conclude that the expert's comments here were purely speculative.

¶45. Additionally, we find the trial court relied on ample evidence other than the expert's testimony to find in favor of the hospital. First, one of the hospital's nurses testified that the turns the hospital failed to document only indicated "left" and "right" turns. Based on her testimony, there are other ways to document a turn or repositioning of a patient, such as repositioning with pillows. The hospital's records do demonstrate that Erriel was frequently repositioned with pillows, during baths and during other types of care. Additionally, the

14

specialty bed that Erriel was given alternated pressure every ten to fifteen minutes. This concrete evidence furthers our finding that the trial court did not commit manifest error in its finding that the hospital met the standard of care with regard to turning and repositioning Erriel.

¶46. There is also evidence in the record that suggests that even closely following the standard of care, Erriel's stage II ulcer at the hospital may have been inevitable. Erriel had a consistent history of bedsores. Her sepsis, malnourishment, and generally dire condition upon admission, coupled with the fact that her ulcer failed to heal and progressed to stage IV even after she left the hospital into her mother's care, leads to the conclusion that it is much more likely than not that Erriel's body naturally produced bedsores because of her failing health. Therefore, we reject the contention that Erriel's stage II ulcer developed as a result of the hospital's alleged breach of duty.

¶47. Despite Ms. Pittman's argument to the contrary, we find that the expert's testimony was not speculative because it was supported by the record. We also find that additional, concrete evidence in the record supports our conclusion that the trial court did not rely on speculative evidence over conclusive testimony in finding for the hospital.

**CONCLUSION**

¶48. We hold that the trial court's findings were supported by substantial evidence. Specifically, the trial court's conclusions as to Erriel's fracture were supported by substantial evidence. Additionally, Ms. Pittman was not entitled to a presumption of negligence under the doctrine of res ipsa loquitor as to Erriel's fracture, and, as it relates to Erriel's decubitus

15

ulcer, the trial court did not rely on speculative testimony over conclusive documentary evidence in finding for the hospital. Accordingly, the trial court's judgment is affirmed.

¶49. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR.**