## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00212-COA

EDWARD STUART AND JUDY STUART                    APPELLANTS

v.

ST. DOMINIC-JACKSON MEMORIAL                              APPELLEES
HOSPITAL AND STEPHEN CRAWFORD

| | |
|---|---|
| DATE OF JUDGMENT: | 12/28/2018 |
| TRIAL JUDGE: | HON. JEFF WEILL SR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANTS: | DAVID EARL ROZIER JR. RICHARD PAUL WILLIAMS III JENESSA JO CARTER HICKS DARYL MATTHEW NEWMAN |
| ATTORNEYS FOR APPELLEES: | JOHN ERNEST WADE JR. STEPHEN P. KRUGER CLAIRE W. KETNER THURMAN LAVELLE BOYKIN III |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 09/01/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**McCARTY, J., FOR THE COURT:**

¶1.     A patient brought a medical-malpractice action against a hospital and his physician alleging that he ended up partially paralyzed as a result of their failures during a CT scan and myelogram.  The trial court found that the patient's expert testimony on the required element of causation was too speculative to be admissible.  As a result, summary judgment was granted to the hospital and physician.  Aggrieved, the patient now appeals.

**FACTS**

¶2.     Edward Stuart was injured in an auto accident in 1997 that left him totally and permanently disabled.  Although Stuart could still "ambulate" and care for himself, he was completely incapable of work of any kind.  Following the accident, Stuart was under the care of multiple physicians, including a neurosurgeon.

¶3.     In July 2010, Stuart began to experience difficulty opening and closing his hands, as well as increased spasticity, which is a muscular contraction causing tightness or stiffness.  Stuart also began to experience increased quadriparesis, which is weakness in all four extremities.  Two weeks after the onset of his symptoms, Stuart was admitted to St. Dominic's Hospital to investigate his complaints.

¶4.     On July 28, 2010, a computed tomography (CT) scan was ordered to explore the cause of his condition.[1]  The scan required Stuart to extend his arms above his head to fit into the CT machine.  Stuart told the technician that he was physically unable to lift his arms.  According to the patient, the hospital technician forcefully pulled his arms over his head to force him into the machine.  Stuart then began experiencing uncontrollable, full-body spasms.  Stuart continued to experience the spasms for the duration of his hospitalization.

¶5.     Two days later, on July 30, Stuart was scheduled to have a three-level myelogram by Dr. Stephen Crawford.[2]  However, Stuart's paraesthesia prevented him from cooperating as

---

[1] A computed tomography, or CT scan, combines a series of X-ray images to form a computer-generated image of a single-body plane.

[2] A myelogram is a specialized imaging test used to evaluate spinal cord damage.  The procedure involves injecting a contrast dye into the patient's spine.  The patient's table is then titled in different ways to allow the dye to move up and down through the spine.

2

needed to perform the procedure.[3] So Dr. Crawford halted the myelogram and converted the procedure to a CT scan with contrast.

¶6.     This procedure required Dr. Crawford to perform a lumbar puncture to inject a contrast dye into Stuart's spine. Stuart informed the physician that he was experiencing spasms about eight minutes apart and asked to wait until he had completed a spasm before proceeding with the injection. Stuart testified that Dr. Crawford ignored his request and continued with the procedure. Stuart stated that he suffered a severe, uncontrollable spasm at the exact time of puncture, and was immediately paralyzed. Following the procedure, a Professional Emergency Response Team was called, and Stuart was admitted to the Intensive Care Unit.

¶7.     Stuart has been bedridden since his hospitalization and now requires twenty-four-hour care.

## PROCEDURAL HISTORY

¶8.     In September 2012, Stuart filed a medical-malpractice claim against St. Dominic and Dr. Crawford for the injuries he allegedly sustained while in their care.[4]

---

[3] Paraesthesia is an abnormal sensation in the body, such as burning, pricking, or tingling.

[4] Stuart's wife, Judy, joined Edward as a plaintiff in the complaints against St. Dominic and Dr. Crawford, alleging loss of consortium. Because her specific claim is not mentioned or addressed in this appeal, we will refer to the plaintiff-appellants as "Stuart" for the sake of clarity and brevity.
     Also named as defendants in the action were Scott McPherson, Benton Parker, William Tew, Andrew Smyth, Kanisha Martin, Trey Lathem and Lisa Lathem, as the natural parent and guardian of Trey Lathem. The claims against those defendants were voluntarily dismissed without prejudice.

3

¶9.     Dr. Crawford responded to Stuart's claims with a motion for summary judgment.  He alleged that Stuart had failed to provide any sworn, expert testimony establishing a breach in the standard of care or the cause of Stuart's neurologic deterioration.  St. Dominic joined and adopted Dr. Crawford's motion as to the lack of causation.

¶10.    In his motion, Dr. Crawford argued the claims and conclusions of Stuart's unsworn expert testimony were erroneous and based on facts easily rebutted by a review of the medical records.  Specifically, Dr. Crawford argued that Stuart was not paralyzed as a result of the lumbar puncture.  In support, he pointed to flowsheets from Stuart's hospitalization and Stuart's own testimony, where he conceded that he was not paralyzed.

¶11.    At 5:00 p.m. on July 30, 2010, it was documented that Stuart had "purposeful" movement in both of his arms but "no movement" in either of his legs.  At 7:00 p.m. the same day, it was documented that Stuart could "only lift arms slightly off bed, no use of hands."  Thirty minutes later, a note was added, stating, "Dr. Lewis thinks that pain med pump with baclofen is non functional and the source of his problems today."[5]

¶12.    The next morning at 7:00 a.m., the flowsheet documented "wk. move/request purposeful" for each of Stuart's extremities.  The sheet also stated, "pt very weak when gripping, pt is able to lift hands slightly. pt able to wiggle toes, but unable to move legs."  Later that day at 7:00 p.m., the chart indicted "still very limited" next to each extremity.

¶13.    Attached to Dr. Crawford's motion was an affidavit from neurosurgeon Dr. John

---

[5] Baclofen is a medication used to treat muscle spasms.

Davis. Dr. Davis opined that the needle and dye were appropriately placed and the lumbar puncture did not cause Stuart's alleged paralysis or any other neurological injury.

¶14. Stuart responded to the motions for summary judgment with sworn affidavits from his designated expert witnesses—Dr. Robert Kowalski, an expert in the field of neurosurgery, and Dr. David Wiener, an expert in the fields of general neurology and neuroradiology. Each expert opined that St. Dominic and Dr. Crawford had breached the standard of care with regard to their treatment of Stuart during his hospitalization. Specifically, "St. Dominic and its staff breached the standard of care by failing to determine Mr. Stuart's physical limitations prior to positioning in radiology, failing to listen and follow Mr. Stuart's instructions regarding his physical limitation in positioning, by forcefully pulling Mr. Stuart's arms over his head . . . and by performing the myelogram procedure without regard to Mr. Stuart's uncontrollable spasms."

¶15. Dr. Kowalski and Dr. Wiener each testified that these breaches in the standard of care caused Stuart's "constant, severe and uncontrollable spasms" and that Stuart's "paralysis was directly related to the breaches in the standard of care by St. Dominic Hospital and Dr. Stephen Crawford."

¶16. Dr. Crawford filed a rebuttal to Stuart's response, which St. Dominic joined. Referring to the same evidence presented in his initial motion, Dr. Crawford again argued that Stuart's claims and expert testimony were not supported by sufficient facts and data and contradicted the evidence.[6]

---

[6] Dr. Crawford made note that at the time of his rebuttal, he had not yet received Dr. Kowalski's affidavit and only had his unsworn opinion from the designation of experts.

¶17.	The trial court denied both motions for summary judgment. The court held that "the sworn expert affidavits [of Dr. Wiener and Dr. Kowalski] . . . sufficiently established genuine [issues of] material fact concerning the alleged medical negligence during the treatment of Mr. Stuart at St. Dominic's and during the myelogram preparation and procedure."

*Second Motions for Summary Judgment*

¶18.	St. Dominic and Dr. Crawford then sought and were granted permission to take out-of-time discovery depositions of Stuart's experts. Thereafter, St. Dominic and Dr. Crawford each filed renewed motions for summary judgment. In addition to reasserting the issues from their first motions for summary judgment, they incorporated challenges to the admissibility of Stuart's expert witnesses. Both argued that Dr. Kowalski's and Dr. Wiener's testimony were speculative, conclusory, facially insufficient to create a genuine issue of material fact for trial, and otherwise inadmissible. They claimed that Stuart lacked admissible expert testimony to support each element of his claim so as to establish a prima facie case of medical negligence—especially in regard to causation.

¶19.	St. Dominic included a patient history and the physical Dr. Gary Nowell conducted upon Stuart's admission from the emergency department early on the morning of July 28, 2010—before any radiological procedures were performed. Dr. Nowell documented that Stuart was experiencing increased spasticity and was no longer able to stand from his wheelchair without assistance. Dr. Nowell also documented that Stuart was experiencing burning or tingling and increased weakness of both legs as well as difficulty lifting his arms above his shoulders. The document also recorded that Stuart's pain pump contained

6

baclofen.

¶20.    In Dr. Crawford's motion, he argued that neither of Stuart's experts could testify to causation to a reasonable degree of medical probability.  He argued that the depositions only showed a temporal connection.

¶21.    Stuart responded with a motion to strike the second motions for summary judgment. In his motion, Stuart argued that the renewed motions were redundant because they raised the same arguments that the trial court had already ruled upon and denied.  Stuart pointed out that the case had already been pending for six years—since 2012.  He argued that the renewed motions for summary judgment raised merely a month and a half before trial were merely delay tactics by the defendants.

¶22.    Dr. Crawford filed a response to Stuart's motion to strike, which St. Dominic joined. In his response, Dr. Crawford argued that the motion was improper because Mississippi Rule of Civil Procedure 12(f) was intended for pleadings and not post-discovery motions.  He also asserted that the purpose of his renewed motion for summary judgment was to show that Stuart's experts' testimony was inadmissible, illusory, and speculative.  Dr. Crawford conceded that the depositions were taken after the deadline, but he noted that Stuart had agreed to the dates for the depositions.

¶23.    Dr. Crawford also asserted that even though the motion came only a month and a half before trial, it was filed "in compliance with the Court's own published [p]olicies requiring potentially dispositive motions to be filed at least 45 days in advance of trial."  Lastly, Dr. Crawford argued that Stuart made no argument or showing as to how he was prejudiced.

¶24. Via email, the staff attorney for the trial court advised the parties that the circuit court judge had "been involved in a lengthy election and two complex Motions for Summary Judgment were filed and briefed very recently in this matter. Accordingly . . . the trial next week will not go forward." The trial court requested complete transcripts of the expert witness depositions and informed the parties that it would address the renewed motions based on the written submissions.

¶25. After receiving this notification, Stuart filed his response to the renewed motions, incorporating his motion to strike and renewing his request for oral argument. Stuart argued that the newly developed deposition testimony further supported the trial court's original denial of summary judgment. Attached to the response was a supporting affidavit by Dr. Adam Lewis, who was Stuart's treating neurosurgeon before, during, and after his admission to St. Dominic.

¶26. St. Dominic and Dr. Crawford both offered rebuttals to Stuart's response to the renewed motions. They again challenged the admissibility of Stuart's experts, claiming that Dr. Kowalski's and Dr. Wiener's opinions were speculative and that they were unable to reliably establish causation.

¶27. After reviewing the motions and deposition transcripts, the trial court granted both of the renewed motions for summary judgment. The trial court found that Stuart's experts could not establish causation in terms of reasonable medical probability and were therefore speculative and inadmissible.

**DISCUSSION**

¶28. The overarching issue before this Court is whether the trial court erred in finding that Stuart failed to present sufficient evidence to withstand a motion for summary judgment in his medical malpractice action. An essential part of the claim in a medical malpractice case is to show that the medical provider's breach of a standard of care was the proximate cause of the injury. This appeals turns on whether Stuart's expert testimony was admissible, and if so, whether it sufficiently established breach and causation.

¶29. Stuart also challenges the procedure of motion practice before the trial court that resulted in the grant of summary judgment. We address this procedural issue before the substantive issue.

## I. The trial court's procedures were not improper.

¶30. Stuart combines a variety of challenges to the motion practice and procedure of the trial court as a corollary attack on the substantive grant of summary judgment.

### A. The trial court did not err by failing to make a formal ruling on Stuart's motion to strike.

¶31. Stuart argues that the trial court erred by failing to make a formal ruling on his motion to strike St. Dominic's and Dr. Crawford's renewed motions for summary judgment. However, Stuart fails to cite any authority in support of his argument.

¶32. Mississippi Rule of Appellate Procedure 28(a)(7) requires an appellant's brief to "contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, *with citations to the authorities*, statutes, and parts of the record relied on." (Emphasis added).

¶33. Even if Stuart had included citations to authority, his claim would still be moot. A

9

trial court's grant of summary judgment, coupled with its final judgment, may serve as an "implicit denial of any outstanding motions." *Lucas v. Baptist Mem'l. Hosp.-N. Miss. Inc.*, 997 So. 2d 226, 231 (¶14) (Miss. Ct. App. 2008). Here, the trial court implicitly denied Stuart's motion to strike the renewed motions for summary judgment by granting the motions for summary judgment. Because the trial court granted summary judgment, this issue is without merit.

### B.    The trial court did not err by allowing out-of-time discovery.

¶34.    Stuart takes issue with St. Dominic's and Dr. Crawford's deposing Dr. Kowalski and Dr. Wiener. He argues that the depositions occurred after the discovery deadline, which he alleges was obtained by misleading both his counsel and the trial court.

¶35.    "Our standard of review of a trial court's management of the pre-trial discovery process is abuse of discretion." *Partin v. N. Miss. Med. Ctr. Inc.*, 929 So. 2d 924, 936 (¶57) (Miss. Ct. App. 2005).

¶36.    Following the denial of their motions for summary judgment, St. Dominic and Dr. Crawford sought to reopen discovery. At the time, there had already been at least eight prior agreed scheduling orders with progressing discovery deadlines entered in this case. The defendants argued that the depositions were needed for two reasons: (1) to determine whether Stuart's expert testimony should be challenged at trial; and (2) because the affidavits of Stuart's experts contained new affirmative allegations the defendants had not been able to observe in the designation of experts. The first "new" allegation was that the allegedly forceful positioning of Stuart prior to his myelogram caused spasms leading to his injury.

The second was that Dr. Crawford breached the standard of care by ignoring Stuart's request to wait until his spasm was over before he inserted the needle. The third was that Stuart suffered a severe spasm at the exact moment the needle was inserted, causing his injury.

¶37. Stuart opposed the request and pointed out that the scheduling order deadlines expired after six years, dispositive motions had been resolved, and the parties were ready for trial. He noted that the defendants had waited over six months after their first motions were denied before they sought to take expert depositions—long after the deadline in the agreed scheduling order had passed. Additionally, Stuart argued that all of the referenced claims were included in his deposition testimony.

¶38. The court granted the request to conduct the late expert depositions but set a sixty-day deadline. St. Dominic and Dr. Crawford independently deposed Stuart's expert witnesses. The defendants deposed Dr. Kowalski on July 30, 2018, and Dr. Wiener on September 6, 2018. The depositions took place 96 and 144 days, respectively, after the designated deadline.

¶39. Stuart now argues that in addition to being untimely, the defendants misled the trial court and himself into allowing the depositions by stating that they were needed to determine if they were going to challenge Stuart's experts *at trial*.

¶40. "[T]his Court has neither the prerogative nor the inclination to mire itself in the details of managing the pre-trial discovery process, which is properly left to the discretion of the trial court." *Id*. at 939 (¶61). Here, we cannot find that the trial court abused its discretion by allowing depositions of Stuart's experts past the original deadline. Accordingly, this issue

11

is without merit.

**C.    The trial court did not err by considering the renewed motions for summary judgment without a hearing.**

¶41.    Stuart claims it was error for the trial court to consider the renewed motions for summary judgment without a hearing. He argues that hearings are required on motions for summary judgment. Crawford argues that this issue is waived because Stuart did not properly preserve the issue by objection.

¶42.    Our Supreme Court "repeatedly has held that in order to preserve error for appellate review, a contemporaneous objection must be made, and if no objection is made, the appellant waives the error." *Evans v. City of Aberdeen*, 926 So. 2d 181, 185 (¶13) (Miss. 2006).

¶43.    Stuart argues that this issue is not waived because he repeatedly requested the trial court to grant a hearing in his motion to strike and in emails with the court staff.

¶44.    Procedural bars aside, Stuart's argument does not have foundation in our law. "Rule 56 of the Mississippi Rules of Civil Procedure neither explicitly nor implicitly provides the right to a hearing on a motion for summary judgment." *Tunica County v. Town of Tunica*, 227 So. 3d 1007, 1026 (¶46) (Miss. 2017). "Motion practice is more generally governed by Rule 78, and [our Supreme Court] has held that Rule 78 [of the Mississippi Rules of Civil Procedure] does not provide for the right to a hearing on a summary judgment motion." *Id.* at 1026-27 (¶46).

¶45.    A prior version of Rule 78 provided, in part, "To expedite its business, the court may make provision by rule or order for the submission and determination *of motions not seeking*

12

*final judgment* without oral hearing upon brief written statements of reasons in support and opposition." M.R.C.P. 78 (2002) (emphasis added). However, as of 2003, the rule no longer includes "of motions not seeking final judgment." The rule was explicitly amended "to allow the courts, by rule to provide for determination of motions seeking final judgment without oral argument." M.R.C.P. 78 cmt.; *accord Harris v. Fort Worth Steel & Mach. Co.*, 440 So. 2d 294, 296 (Miss. 1983) ("Trial courts have inherent authority and duty to control their dockets for the orderly disposal of business").

¶46.    Pursuant to *Tunica County*, a hearing was not required before summary judgment was granted.

### D.    The grant of summary judgment is not subject to a heightened standard of review.

¶47.    Stuart argues that the trial court's orders granting St. Dominic's and Dr. Crawford's motions are subject to heightened scrutiny because they were adopted verbatim from an order prepared by defense counsel. Yet it is already a matter of law that "[a] trial court's grant of summary judgment is reviewed de novo." *Howard v. Rolin Enters LLC*, 284 So. 3d 772, 775 (¶5) (Miss. Ct. App. 2019). That is to say, we completely review the grant of summary judgment anew, or afresh, without deference to the trial court's ruling. Therefore a different standard of review is not needed when the applicable one is already a completely new look at the case. *See Hosey v. Mediamolle*, 963 So. 2d 1267, 1269 (¶3) (Miss. Ct. App. 2007) (declining "to review the granting of [a] motion for summary judgment under a heightened standard because the order was 'essentially prepared by defense counsel'").

### II.    The trial court properly granted summary judgment to Dr.

**Crawford.**

¶48.    Dr. Crawford argues that summary judgment was proper because Stuart failed to establish a prima facie case of medical malpractice.  He contends that neither of Stuart's experts identified an act or omission by which he breached the applicable standard of care.

¶49.    "To establish a prima facie case of medical malpractice, the plaintiff must prove: (1) the existence of a duty by the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) a failure to conform to the required standard; and (3) an injury to the plaintiff proximately caused by the breach of such duty by the defendant."  *Univ. of Miss. Med Ctr. v. Littleton,* 213 So. 3d 525, 535 (¶29) (Miss. Ct. App. 2016).

¶50.    "Absent expert medical testimony that articulates the duty of care a physician owes to a particular patient under the circumstances and identifies the particular point that the physician breached that duty and caused injury to the plaintiff, a plaintiff's claim for negligence must fail."  *Potter v. Hopper*, 907 So. 2d 376, 380 (¶10) (Miss. Ct. App. 2005).

¶51.    Neither of Stuart's witnesses testified as to how Dr. Crawford breached the applicable standard of care in performing the lumbar puncture.  During his deposition, Dr. Wiener testified that the puncture was performed precisely.

> Q.    All right.  So as far as you know, from a technical standpoint, the injection of the dye by Dr. Crawford was a success?
> A.    Correct.
> Q.    He got it where – he put the needle where he intended to put it?
> A.    Correct.
> Q.    The dye went where he intended it to go?
> A.    Yes.
> . . . .

14

Q. [W]ell, you find no problem with his technique that he used?
A. Correct.

Additionally, Dr. Kowalski testified that he could not give an opinion on whether Dr. Crawford deviated from the standard of care in the technique he used and employed on Stuart during the lumbar puncture. Accordingly, because Stuart could not point to a specific breach of the standard of care, we affirm.

¶52. That does not mean that the lumbar puncture did not impact Stuart's quadriparesis or contribute to a decline in his motor ability. However, when expert testimony is required, as in the present case, the expert must "articulat[e] the requisite standard that was not complied with[.]" *Littleton*, 213 So. 3d at 535 (¶29) (internal quotation mark omitted). That was not done here.

¶53. Stuart further argues that Dr. Crawford breached the standard of care by not personally obtaining informed consent to conduct the procedure. Dr. Wiener testified that "[a]n informed consent for an invasive procedure should be performed by the physician or an elevated physician extender, such as a nurse practitioner or a physician's assistant[.]" However, the record does not reflect who obtained the informed consent and whether it was an "elevated physician extender" or other hospital personnel.

¶54. More importantly, Dr. Wiener testified that he could not answer how the delegation of the informed consent made any difference in this case. He could only point to deficiencies in the consent, but he could not "pinpoint a direct connection between the performance of informed consent and the injuries to the patient[.]" Without a causal link to Stuart's alleged injuries, we cannot find evidence to support going to trial. The grant of summary judgment

to Dr. Crawford is affirmed.[7]

### III. The trial court erred by granting summary judgment to St. Dominic for the incident on July 28, 2010.

¶55. Stuart argues that the trial court erred by finding his experts' testimony inadmissible and granting summary judgment to St. Dominic.

¶56. "When a plaintiff fails to provide expert testimony establishing a prima facie case of medical malpractice, generally, a grant of summary judgment is required." *Miss. Baptist Med. Ctr. Inc. v. Phelps*, 254 So. 3d 843, 845 (¶7) (Miss. 2018). "Expert testimony is essential in medical malpractice cases because the expert testimony demonstrates how the required standard of care was disregarded, and the testimony certifies that the defendant's failure was the proximate cause, or proximate contributing cause of the injury." *Id.* (internal quotation marks omitted).

¶57. "A trial court's admission or exclusion of expert testimony is reviewed for an abuse of discretion[,] . . ." and that "decision will stand unless the reviewing court concludes that the decision was arbitrary and clearly erroneous[.]" *Yerks v. Trest*, 246 So. 3d 956, 959 (¶9) (Miss. Ct. App. 2018) (quoting *Worthy v. McNair*, 37 So. 3d 609, 614 (¶13) (Miss. 2010)).

¶58. Our Supreme Court has adopted the two-prong "*Daubert/Kumho*" rule "as the standard for assessing the admissibility of expert testimony." *Worthy*, 37 So. 3d at 614 (¶14);

_____

[7] Because we affirm summary judgment to Dr. Crawford for the incident on July 30, 2010, we must also affirm summary judgment to St. Dominic for the same incident. Without an error to rest upon, vicarious liability does not attach to an employer. If the agent was not negligent, then it cannot be found that the principle was negligent. *See J & J Timber Co. v. Broome*, 932 So. 2d 1, 6 (¶21) (Miss. 2006) ("Where a party's suit against an employer is based on respondeat superior, the vicarious liability claim itself is extinguished when the solely negligent employee is released.").

*see Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 38 (¶16) (Miss. 2003); *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). "First, the court must determine that the expert testimony is relevant[.]" *McLemore*, 863 So. 2d at 38 (¶16). "Next, the trial court must determine whether the proffered testimony is reliable." *Id.* "Summarizing *Daubert* and *Kumho*, the *McLemore* Court explained the following: 'the liberal goals of the rules include reducing the traditional barriers to opinion testimony.'" *Worthy*, 37 So. 3d at 614 (¶15) (quoting *McLemore*, 863 So. 2d at 36 (¶10)).

¶59.    "Rule 702 [of the Mississippi Rules of Evidence] also provides three requirements that were added after *Daubert* and *Kumho Tire*." *Hubbard ex rel. Hubbard v. McDonald's Corp.*, 41 So. 3d 670, 675 (¶18) (Miss. 2010). "These requirements are that: (1) the expert testimony must be based on sufficient facts or data, (2) it must be the product of reliable principles and methods, and (3) the expert must have reliably applied the principles and methods to the facts of the case." *Id.* (quoting M.R.E. 702).

¶60.    "The *McLemore* Court emphasized that the trial court's role as gatekeeper is not intended as a replacement for the adversary system . . . ." *Worthy*, 37 So. 3d at 614 (¶18) (quotation marks omitted). "The weight and credibility of expert testimony are matters for determination by the trier of fact." *Hubbard*, 41 So. 3d at 675 (¶19). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence." *Id.*

¶61.    Here, there is no dispute as to the relevance of Dr. Kowalski's and Dr. Wiener's

17

testimony or to their qualifications. The inquiry is whether their testimony was reliable. The trial court held that Dr. Kowalski's and Dr. Wiener's testimony was not reliable because their opinions were not supported by reliable facts and data and because they were speculative.

### A. The experts' opinions were based on reliable facts and data.

¶62. "The testimony of a physician is sufficiently reliable if his opinions are based on his interpretation of medical records in light of his experience, training, and expertise as a qualified physician in his field of medicine." *Turner v. State*, 282 So. 3d 1006, 1023 (¶46) (Miss. Ct. App. 2020) (internal quotation mark omitted). "Unlike an ordinary witness[,] an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Poole v. Avara*, 908 So. 2d 716, 724 (¶16) (Miss. 2005) (quoting *Daubert*, 509 U.S. at 592). "Absent other grounds to exclude, an expert's testimony is presumptively admissible . . . ." *Id*.

#### i. Dr. Kowalski's opinions were supported by the evidence.

¶63. St. Dominic argues that Dr. Kowalski's opinions are inadmissible because they are based entirely on Stuart's testimony. "[E]xperts in many fields, including medicine . . . frequently rely on histories provided by patients and witnesses." *Treasure Bay Corp. v. Ricard*, 967 So. 2d 1235, 1240 (¶17) (Miss. 2007). "[I]t would be unsettling for this Court abruptly to reject all expert opinion which relies on a historical account of the facts." *Id*. "[W]hether or not the facts relied upon are credible is a matter for cross-examination and collateral attack at trial." *Id*. This is squarely in accord with longstanding precedent regarding experts.

18

¶64. In each of their affidavits, Dr. Kowalski and Dr. Wiener testified that they had reviewed Stuart's medical records, "including but not limited to, records from St. Dominic Hospital, Mississippi Methodist Rehabilitation Center, Jackson Neurology Clinic, Internal Medical Group, Jackson Heart Clinic, and Jackson Pulmonary Associates." They also testified that they had reviewed the transcripts of the depositions taken in this case. During his deposition, Dr. Wiener testified that he had based his opinions "upon Mr. and Mrs. Stuart's deposition, Dr. Kowalski's deposition,[ ] the medical records[,]" and "Dr. Crawford's deposition."

¶65. However, when asked what source of information from before the lumbar puncture he relied on, Dr. Kowalski conceded that the only source of information prior to the lumbar puncture that he relied on was Stuart's testimony. In other words, the only information he relied on to determine positioning during the CT scan came from Stuart.

¶66. Dr. Adam Lewis, Stuart's treating physician before, during, and after his hospitalization also testified. As Stuart's treating physician before, during, and after his hospitalization, Dr. Lewis was "extensively familiar with Mr. Stuart's medical condition, his prior diagnoses, and the progression of his medical condition." Dr. Lewis personally examined Stuart immediately after his hospitalization and found him to be "densely quadriparetic in all four extremities." Dr. Lewis testified that the weakness Stuart experienced in all four of his limbs during his hospitalization was "not a natural progression of his underlying medical condition." Instead, Dr. Lewis opined that the "quadriparesis was a result of an acute traumatic insult to Stuart that occurred during his July 2010 admission

19

to St. Dominic Hospital" and that the spasms "led to an abrupt quadriparesis during the procedure of July 30, 2010."

¶67.   Stuart testified under oath that he had told the technician he was physically unable to life his arms as necessary to fit into the CT machine.  He stated that, despite this warning, the technician "grabbed my hands and pulled them through the ring [of the CT machine], all the way through the ring.  And when I got through, I was starting to have spasms.  My head would go down towards my inguinal area.  My legs would come up to my inguinal area.  And it happened frequently, you know, back and forth, back and forth about eight minutes at a time."

¶68.   In support of their argument, St. Dominic cites to a case where this Court held that history given by a patient to a physician was not conclusive proof of the cause of injury.  *Day v. Ocean Springs Hosp. Syst.*, 923 So. 2d 246, 252 (¶19) (Miss. Ct. App. 2006).  In that case, "[n]o physician opined that [the appellant's] injury only could have been caused as alleged by [the appellant,]" and "the sole proof that [the appellant]'s wrist injury had been caused by an accident . . . was the history which [the appellant] gave to her physicians and upon which they based their opinions as to causation."  *Id*. at 251-52 (¶¶17, 19).  This Court held that "[the appellant's] recitation of the history of the injury to her physicians fell far short of conclusively establishing the cause of injury and entitling her to a directed verdict."  *Id*. at 252 (¶19).

¶69.   Unlike in *Day*, Dr. Kowalski's and Dr. Wiener's testimony was supported by the medical records, the deposition testimony of both Stuart and his wife, and the affidavit of

20

Stuart's treating physician.

¶70. We find no reason to doubt Stuart's description of events that he *testified* to *under oath*. Further, whether or not the events are true as described by Stuart in his deposition is a matter for the jury to decide. *Treasure Bay Corp.*, 967 So. 2d at 1240 (¶17) ("Of course, whether or not the facts relied upon are credible is a matter for cross-examination and collateral attack at trial"); *see also Hart v. Howard*, No. 1:11-cv-83-LG-RHW, 2012 WL 3000654, at *2 (S.D. Miss. July 23, 2012) (holding that an expert's conclusions were sufficiently reliable when the expert only reviewed the emergency room records and his entire deposition only ran to ten pages).

¶71. Here, Dr. Kowalski's and Dr. Wiener's testimony was supported by the medical records, the deposition testimony of both Stuart and his wife, and the affidavit of Stuart's treating physician.

> ii. *Dr. Kowalski's opinions were founded on his education, training, and experiences.*

¶72. St. Dominic argues that Dr. Kowalski's opinions are unreliable because he could not point to any literature in support of his opinion that forcefully moving a patient's arms can subsequently cause lower extremity spasms.

¶73. During his deposition, Dr. Kowalski was asked to provide literature in support of his opinion. While Dr. Kowalski did not have an article on hand, he testified that "there's plenty of literature" and that his "education, training, and experience would more than explain, again, the scenario where that chain of events, that being some forceful movement, in this case, of the upper extremities would transmit pressure to the cervical spine in somebody with

21

baseline cervical spondylosis and already having a previous surgery would be at risk for causing further spinal cord injury."

¶74. St. Dominic argues that relying on his own experience was insufficient, as Dr. Kowalski could not think of a case where he treated a patient who had suffered lower extremity spasms or paraplegia as a result of having his arms extended above his head. Dr. Kowalski admitted that he could not recall having treated a patient under that exact scenario. However, the neurosurgeon had treated numerous patients and experienced multiple cases where there has been some trauma or force to the upper body that resulted in spinal cord injury. He explained the "upper motor phenomenon"—where something happens in the upper part of the spine and affects everything downstream. He also explained that the spasms were not a result of an injury to Stuart's arms but rather the result of damage to his cervical spine that occurred when his arms were being forcefully lifted.

### iii. Dr. Kowalski's opinion that Stuart suffered spasms was supported by the evidence.

¶75. St. Dominic also contends that Dr. Kowalski's opinion contradict the medical records. Specifically, his opinion that Stuart suffered spasms between the July 28 CT scans and July 30 lumbar puncture are not supported by the medical records.

¶76. "[A] qualified medical expert is permitted to extrapolate causation testimony from the patient's clinical picture although the medical records contain no objective medical evidence establishing causation." *Hubbard*, 41 So. 3d at 678 (¶27).

¶77. This case is akin to the decision in *Hubbard*, where the Supreme Court reversed the trial court's ruling that an expert's opinion was inadmissible because it was not sufficiently

reliable. *Id*. at (¶30). There, the medical records did not establish the cause or significantly contributing cause of the plaintiff's injuries. *Id*. at (¶29). However, the Supreme Court found that the expert's testimony was admissible because his opinion "was based on his interpretation of the medical records in light of his experience, training, and expertise as a qualified obstetrician and gynecologist." *Id*. The Court held that the expert should have been permitted to offer his causation theory because his opinions "constituted a scientifically grounded theory of causation, not the 'junk science' which the *Daubert* court sought to preclude from jury consideration." *Id*. (internal quotation marks omitted).

¶78. St. Dominic supports its argument by citing to a case where a proposed expert based his opinion on alleged symptoms that "were not noted by any of the numerous medical providers assisting [the claimant], but instead [were] alleged only by lay family members, and [were] directly contrary to the documented medical records[.]" *Hodges v. Univ. of Miss. Med. Ctr.*, 226 So. 3d 602, 607-08 (¶24) (Miss. Ct. App. 2017). In that case, the proposed expert was found inadmissible for a plethora of reasons. *Id.* at 606-08 (¶¶21, 23-25). There, the expert could only describe the applicable standard of care as one "he formulated in his own head" and what he would have personally done. *Id*. at 607 (¶23). This directly conflicted with the objective requirement of Mississippi Rule of Evidence 702. "[A]n expert witness must articulate an objective standard of care." *Hodges*, 226 So. 3d at 607 (¶23).

¶79. The expert also could not provide the cause of the injuries but instead testified that medical negligence "can be inferred simply when a patient experiences complications"—an assumption contrary to Mississippi law. *Id*. ("Mississippi law is clear that the simple

existence of medical complications is not considered a breach of the standard of care"). In addition to the above-mention reasons, the trial court also found that the expert was unqualified because he had no familiarity with the defendant-hospital or a similar setting, and in fact had not had hospital privileges for over a decade. *Id*. at 606-07(¶¶19, 21).

¶80. This case is closer to *Hubbard* than *Hodges*. Unlike the expert in *Hodges*, Dr. Kowalski and Dr. Wiener are both qualified in the areas in which they planned to testify and testified to an objective standard of care. Additionally, Dr. Kowalski testified to a mechanism of causation. Dr. Kowalski testified that Stuart's pre-hospitalization spasticity and the spasms following the CT scan were completely separate issues. He explained that they occurred at different parts of the spinal cord and involved different degrees of intensity.

¶81. Furthermore, Stuart references three medical records to support his argument that the spasms were repeatedly documented in the medical records, his testimony, and statements provided by Dr. Lewis. First, Stuart references a physician-progress note where "spasms were repeatedly recorded." The note read, "Patient status post CT myelogram with acute change in sensory and motor function hands and feet, positive lower extremities spasms." However, this note supporting evidence of spasms was erroneously timed. The note was initially timed 7:45 a.m. and then retimed at 7:42 p.m. Simply put, the note was created after the myelogram and does not indicate whether Stuart experienced spasms before the procedure.

¶82. Stuart next points to Dr. Lewis' consultation notes from before the myelogram as an indication that he was given increased baclofren for his spasms. The note stated, "Recent

adjustments to his medication include the addition of bupivacaine to the patient's intrathecal pain pump with baclofen and dilaudid." In the same note, Dr. Lewis recorded that Stuart was experiencing "new increased spasticity in the lower extremities, weakness in the upper and lower extremities . . . [and] visible jerking of the leg." Last, Stuart's third supporting document is the consent form for the myelogram. Stuart was unable to sign the document due to his pain and spasms.

¶83. St. Dominic challenges each of these documents. The hospital argues that Dr. Lewis' note does not support Stuart's testimony because the documented spasms were not described as being the "violent, recurrent full-body spasms" that Stuart described. Additionally, St. Dominic argues that the mention of baclofen does not suggest he was experiencing new spasms because he had been on baclofen for some time. Finally, St. Dominic argues that because Stuart's wife was the one who made the notations on the consent form, it does not constitute a medical record.

¶84. Yet in the end, Dr. Kowalski and Dr. Wiener both based their opinions on their training, education, and experience as a neurologist and neuroradiologist, as well as their review of the medical records and deposition transcripts in this case. As such, their opinions were sufficiently reliable.

## B. The experts' opinions on causation were not speculative.

¶85. "Mississippi jurisprudence does not require medical testimony to contain any magical words, but medical testimony is not probative unless it speaks in terms of probabilities rather than possibilities." *Martin v. St. Dominic-Jackson Mem'l Hosp.*, 90 So. 3d 43, 48 (¶15)

(Miss. 2012). This does not mean "that the subject of expert testimony be known to a certainty . . . , however, because, as the *Daubert* Court pointed out, 'there are no certainties in science.'" *Hubbard*, 41 So. 3d at 678 (¶28) (citation omitted).

¶86. "[S]ome speculation in medical matters is allowable and necessary." *Martin*, 90 So. 3d at 49 (¶15). "Under our standards for the admission of expert testimony, a qualified medical expert is permitted to extrapolate causation testimony from the patient's clinical picture although the medical records contain no objective medical evidence establishing causation." *Hubbard*, 41 So. 3d at 678 (¶27).

¶87. This does not mean an expert opinion may be purely speculative: "an expert opinion based merely on 'subjective beliefs or unsupported speculation' is insufficient, and is properly excluded." *Sanders v. Wiseman*, 29 So. 3d 138, 141 (¶13) (Miss. Ct. App. 2010) (citation omitted). "Only opinions formed by medical experts upon the basis of credible evidence in the case and which can be stated with reasonable medical certainty have probative value." *Cates v. Woods*, 169 So. 3d 902, 907 (¶13) (Miss. Ct. App. 2014) (citation omitted); *accord Univ. of Miss. Med. Ctr. v. Littleton*, 213 So. 3d 525, 536 (¶¶29, 31) (Miss. Ct. App. 2016) (excluding a purely speculative opinion).

¶88. St. Dominic argues that Dr. Kowalski's and Dr. Wiener's opinions regarding the causation of Stuart's alleged injuries from the July 28, 2010 CT scan were speculative and inadmissible. St. Dominic contends that neither expert could identify with certainty the mechanism of injury, how Stuart was positioned, or that the alleged injuries could have only resulted from a breach in the standard of care.

26

¶89. Stuart argues that this case is similar to two others in which our Supreme Court held that an expert does not need to testify with absolute certainty. *See Poole*, 908 So. 2d at 724 (¶15); *Stratton v. Webb*, 513 So. 2d 587, 590 (Miss. 1987).

¶90. In *Poole*, the defense expert testified that CPR and resuscitation attempts, not the defendant's medical negligence, caused a suture in the patient's colon to tear. *Poole*, 908 So. 2d at 721-22 (¶10). The claimant argued that the testimony was unreliable and inadmissible because the expert's theory had never been the subject of peer review. *Id*. at 724 (¶17). The Court held that the testimony was admissible because it was a medical opinion based in science—not conjecture—and it was the jury's role to weigh the evidence. *Id*. at 724-25 (¶18)

¶91. In *Stratton*, a woman sought damages for injuries she incurred in a car accident. *Stratton*, 513 So. 2d at 588. Following the wreck, but before trial, she was again injured in multiple subsequent accidents. *Id*. at 589. Her treating physician, testifying as an expert witness, opined that there was reasonable medical certainty that her injuries were related to the first wreck—even though he could not positively state the cause of her back injury. *Id*. at 590. The Court found that the expert's "testimony, taken as a whole, sufficiently established a reasonable medical certainty that the accident caused the injuries." *Id*.

¶92. Both of Stuart's experts conceded that they could not state what position Stuart was in or speak to the events of the procedure. Even though Dr. Wiener testified that positioning was a possible cause of the spasms, he stated that he did not have the information available for him to make an assertion, to a reasonable degree of medical probability, that the

positioning caused Stuart's spasms.  However, he did testify, to a reasonable degree of medical certainty or probability, that the forcible raising of Stuart's arms breached the standard of care.

¶93.    Dr. Kowalski testified that "the mechanism for the spasm is damage to the spinal cord" and "[t]hey put pressure on the cervical spine in positioning—there's no question about that."  He went on to explain that by forcing Stuart's arms into a high position, a stretch was placed on the upper extremity nerves, mainly the brachial plexus, which resulted in stress to his cervical spine and caused an acute-on-chronic injury to the cervical spinal cord around the C 4-5 level.

¶94.    Medical experts are not required to testify to an absolute certainty.  *Stratton*, 513 So. 2d at 590.  Dr. Kowalski's testimony is not speculative according to *Mariner Health Care Inc. v. Estate of Edwards ex rel. Turner*, 964 So. 2d 1138 (Miss. 2007).  Our Supreme Court ruled in *Mariner* that it "does not require that expert testimony conclusively establish the cause of [injury]."  *Id*. at 1144 (¶8).  Rather, "expert testimony must, at a minimum, show that deviations from the standard of . . . care caused or contributed to the [injury]."  *Id*.  Dr. Kowalski and Dr. Wiener were able to testify to a reasonable degree of medical certainty that St. Dominic had breached the standard of care.

¶95.    We must view the evidence "in the light most favorable to the non-moving party."  *Tobias v. Univ. of Miss. Med. Ctr*., 282 So. 3d 1188, 1190 (¶5) (Miss. Ct. App. 2019) (citation omitted).  A jury may ultimately conclude that the hospital did not cause injury to Stuart.  However, we find that the expert testimony creates a genuine issue of material fact

28

sufficient to hurdle summary judgment.

¶96. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**GREENLEE, McDONALD AND LAWRENCE, JJ., CONCUR. BARNES, C.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J. CARLTON, P.J., AND WESTBROOKS, J., NOT PARTICIPATING.**

**WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶97. I concur in part and dissent in part. I concur with the majority that the trial court's order granting summary judgment in favor of Dr. Crawford should be affirmed. I dissent in part because the trial court's order excluding Dr. Kowalski's causation testimony as "speculative and inadmissible" and granting summary judgment in favor of St. Dominic should also be affirmed.

**RELEVANT FACTS AND PROCEDURAL HISTORY**

¶98. Prior to the events at issue in this case, Stuart already had "a long history of chronic pain related to cervical and lumbar spine disease" and was permanently and totally disabled as a result of a 1997 motor vehicle accident. Over the years, Stuart had undergone several spinal surgeries to treat his chronic arachnoiditis (chronic spinal pain), including multiple spinal fusions, a spinal pain pump implant, and a spinal cord stimulator implant. Stuart was admitted to St. Dominic on July 28, 2010, because for two weeks he had experienced "increasing spasticity in both lower extremities with jerking motions bilaterally" and increased pain in his legs and arms. Prior to his admission, he had also been experiencing increased quadriparesis, that is, weakness in all four extremities. Previously, Stuart "had

29

been able to get up and use a walker to get to the bathroom and back" without assistance. However, in the two weeks before he was admitted to St. Dominic, he "suddenly was unable to get up without help from his wife."

¶99. There are two distinct events at issue in this case. First, Stuart alleges that he was injured on the day of his admission to the hospital, July 28, 2010, when an employee of St. Dominic forcefully positioned his arms above his head in order to position him for a CT scan. Stuart alleges that this incident aggravated his preexisting conditions, caused spasms, and contributed to the paraplegia or paresis that he experienced following a procedure performed by Dr. Crawford two days later on July 30.

¶100. One of Stuart's two experts, Dr. Wiener, declined to offer an opinion as to whether the July 28 incident caused or contributed to any injury. Wiener could only say that the incident "may have been contributory to [Stuart's] clinical deterioration" and that he "would defer to the neurosurgery experts" as to the "probabilities" that it contributed.

¶101. Stuart's other expert, Dr. Kowalski, testified:

> It's my opinion that the majority of the neurologic damage that caused the progression to . . . paraplegia [or] dense upper extremity paresis . . . was a combination of the two events, but more likely the majority coming from events on the 30th.

> But I can't exclude that the events on the 28th also had, again, caused some level of damage to the spinal cord and, therefore, some contribution ultimately to his neurologic deterioration.

Kowalski later stated that the damage allegedly caused by the July 28 incident "can't really be parsed out per se" but "would have had to have some role" in Stuart's injuries—or "at least" Kowalski "can't exclude it" as having played some role. In other words, Kowalski

30

identifies the July 28 incident as a proximate cause of Stuart's injuries because Kowalski "can't exclude it" as a possible contributing cause.

¶102. In addition, Kowalski "couldn't [identify] one article per se" that supported his opinion that the forceful raising of Stuart's arms caused spasms in Stuart's lower extremities. Kowalski asserted that "there's plenty of literature" that supports his opinion, but he did not actually identify any such literature. He also stated that his opinion is supported by his "education, training, and experience."

¶103. The trial court concluded that Kowalski's opinion on causation was speculative and inadmissible. Thus, the trial court granted summary judgment in favor of St. Dominic with respect to the July 28 incident. Kowalski's testimony and the trial court's ruling are discussed in more detail below.

¶104. The second event at issue in this case is a procedure performed on July 30 by Dr. Crawford: a lumbar puncture to inject contrast dye into Stuart's spinal canal for imaging. Stuart alleges that he was also injured as a result of negligence during the July 30 procedure. Indeed, as noted above, Kowalski testified that the July 30 procedure was the major cause of Stuart's subsequent paraplegia or paresis.

¶105. In the trial court, Stuart alleged that both Dr. Crawford and St. Dominic breached the standard of care in connection with the July 30 procedure. Primarily, Stuart alleged that Dr. Crawford breached the standard of care by proceeding with the lumbar puncture despite the fact that Stuart was experiencing severe and uncontrollable spasms at the time. Stuart further alleged that he experienced such a spasm at the exact time of the puncture, which led to some

31

error by Dr. Crawford in performing the procedure.

¶106. As it relates to St. Dominic and the July 30 procedure, Stuart alleged that an employee of St. Dominic improperly positioned him on the procedure table prior to the procedure. The trial court granted summary judgment for St. Dominic with respect to this claim because there was no evidence as to how Stuart was positioned. Thus, there was no evidence of any negligence by St. Dominic, and any expert testimony regarding a breach of the standard of care or causation "would be speculative." On appeal, Stuart has waived or abandoned this claim as it relates to St. Dominic.[8] In any event, the trial court's grant of summary judgment in favor of St. Dominic with respect to the July 30 procedure undoubtedly was correct. And because the majority affirms the grant of summary judgment in favor of St. Dominic with respect to the July 30 incident, albeit for different reasons (*see ante* n.7), this separate opinion addresses only Stuart's claim against St. Dominic arising from the July 28 incident.

**ANALYSIS**

¶107. With respect to the trial court's order granting summary judgment in favor of St. Dominic, there are two relevant standards of review. We review the trial court's grant of summary judgment de novo. *McDonald v. Mem'l Hosp. at Gulfport*, 8 So. 3d 175, 178 (¶8)

---

[8] Stuart's appellate briefs do not make any argument that St. Dominic was negligent in connection with the July 30 procedure. In addition, during oral argument in this Court, Stuart's counsel stated, "Our position based on the testimony of Dr. Kowalski . . . is that the allegations on July 30th are with regard to Dr. Crawford and that any positioning injury sustained by Mr. Stuart during that procedure was the responsibility of Dr. Crawford." In his rebuttal argument, Stuart's counsel reversed course and stated that there *is* a claim that St. Dominic breached the standard of care on July 30. In any event, Stuart waived the issue as it relates to St. Dominic by failing to brief it on appeal. *Rosenfelt v. Miss. Dev. Auth.*, 262 So. 3d 511, 519 (¶27) (Miss. 2018); M.R.A.P. 28(a)(3), (7).

(Miss. 2009). However, even at the summary judgment stage, we review the trial court's rulings on the admissibility of expert testimony only for an abuse of discretion. *Id.* at 179 (¶8); *Palmer v. Biloxi Reg'l Med. Ctr. Inc.*, 564 So. 2d 1346, 1357 (Miss. 1990).[9] This is true even if the exclusion of expert testimony results in the grant of summary judgment. *See, e.g.*, *Inn By the Sea Homeowner's Ass'n Inc. v. Seainn LLC*, 170 So. 3d 496, 502, 505 (¶¶15, 27-28) (Miss. 2015).

¶108. With respect to the July 28 incident, the problems with Kowalski's opinion on causation are twofold. First, "[t]he expert opinion of a doctor as to causation must be expressed in terms of medical probabilities as opposed to possibilities." *Univ. of Miss. Med. Ctr. v. Lanier*, 97 So. 3d 1197, 1202 (¶20) (Miss. 2012) (citing *Pittman v. Hodges*, 462 So. 2d 330, 333-34 (Miss. 1984)); *accord Martin v. St. Dominic-Jackson Mem'l Hosp.*, 90 So. 3d 43, 48 (¶15) (Miss. 2012). For example, in *Martin*, the Supreme Court held that an expert's opinion on causation was insufficient to support a jury verdict because the expert could only state that the plaintiff's injuries were caused by either a fall (that allegedly resulted from the hospital's negligence) or normal "wear and tear" that aggravated a preexisting condition. *Martin*, 90 So. 3d at 49 (¶16). Similarly, in *University of Mississippi Medical Center v. Littleton*, 213 So. 3d 525 (Miss. Ct. App. 2016), this Court held that an

---

[9] Contrary to Stuart's argument, the trial court's adoption of a proposed order submitted by St. Dominic does not trigger any sort of "heightened scrutiny." The cases Stuart cites have all been overruled in relevant part by more recent decisions of our Supreme Court. *See Watson Labs. Inc. v. State*, 241 So. 3d 573, 583 (¶17) (Miss. 2018); *Burnham v. Burnham*, 185 So. 3d 358, 360 (¶7) (Miss. 2015); *Miss. Comm'n on Envtl. Quality v. Bell Utils. of Miss. LLC*, 135 So. 3d 868, 877 n.9 (Miss. 2014); *Bluewater Logistics LLC v. Williford*, 55 So. 3d 148, 157 (¶32) (Miss. 2011).

expert's testimony was "mere speculation and insufficient to establish causation" because the expert "could not identify which possible complication of meningitis caused [the patient's] heart to stop" and, thus, could not say whether the hospital could have prevented the patient's death by moving her to the ICU. *Id.* at 537 (¶34).

¶109. Kowalski's causation opinion as it relates to the July 28 incident is, at best, based on possibilities, not probabilities. As set out above (*see supra* ¶101), Kowalski opined (1) that alleged negligence during the surgical procedure on July 30 was the primary cause of Stuart's "paraplegia [or] dense upper extremity paresis" and (2) that the forceful positioning of Stuart's arms above his head on July 28 also made "some contribution ultimately to his neurologic condition." However, the basis for Kowalski's opinion regarding the July 28 incident was simply his inability to "exclude" the possibility that the incident "caused some level of damage to the spinal cord." A doctor's inability to exclude a possibility is not evidence of causation. *See Lanier*, 97 So. 3d at 1202 (¶20). Evidence of a mere possibility permits only speculation regarding causation. *Martin*, 90 So. 3d at 49 (¶16); *Littleton*, 213 So. 3d at 537 (¶34). "[M]edical testimony is not probative unless it speaks in terms of probabilities rather than possibilities." *Martin*, 90 So. 3d at 48 (¶15).

¶110. A second significant problem with Kowalski's causation opinion is that he could offer nothing to support it other than his own "education, training, and experience." Stuart's expert designations stated that Kowalski's opinions were based in part on "[l]iterature related to the medical topics at issue in this." However, during his deposition, Kowalski was asked if he could point to any literature that supported his opinion, and he "couldn't [identify] one

34

article per se." He simply asserted that "there's plenty of literature," without providing the name of even one article or other source. Kowalski then cited his "education, training, and experience" as further support for his opinions.

¶111. "But possessing requisite credentials alone is not enough to render expert testimony admissible." *Fuesting v. Zimmer Inc.*, 421 F.3d 528, 535 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2006). "A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable . . . ." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999). Education, training, and experience are ways to show that a witness is "qualified as an expert," but even then the expert's opinions are admissible only if they are based on "reliable principles and methods . . . reliably applied . . . to the facts of the case." M.R.E. 702(c)-(d).

¶112. A trial court is not required to "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 37 (¶13) (Miss. 2003) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999)). Stated differently, an expert's "self-proclaimed accuracy" is "an insufficient measure of reliability." *Id.* Here, Kowalski's credentials and unidentified (though allegedly plentiful) "literature" do not establish the reliability of his opinion on causation. That opinion was supported "only by the ipse dixit of the expert." *Id.*

¶113. The trial court concluded that Kowalski's causation opinion was impermissibly "speculative and thus inadmissible." As stated above, a trial court's ruling on the

admissibility of expert testimony is reviewed only for an abuse of discretion. *McDonald*, 8 So. 3d at 179 (¶8); *see also Worthy v. McNair*, 37 So. 3d 609, 616 (¶24) (Miss. 2010) ("It is clear that trial judges are given great discretion in their gatekeeping authority under *Daubert*."). I cannot say that the trial court abused its discretion by ruling that Kowalski's causation opinion was speculative and inadmissible. In addition, because Kowalski's testimony was the only evidence Stuart offered on the issue of proximate causation with respect to the July 28 incident, the trial court did not err by granting summary judgment in favor of St. Dominic. *Worthy*, 37 So. 3d at 617-18 (¶31). Accordingly, I would affirm the trial court's grant of summary judgment in favor of St. Dominic.

  **BARNES, C.J., JOINS THIS OPINION.**